UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JONATHAN STUDEN,

                    Plaintiff,

          v.

FUNKO, INC., et al.,

                    Defendants.

CASE NO. C23-0824JLR

ORDER

## I.   INTRODUCTION

Before the court is Defendants Funko, Inc. ("Funko"), Andrew Perlmutter, and Jennifer Fall Jung's (Mr. Perlmutter and Ms. Jung together, the "Executive Defendants," and collectively, "Defendants") motion to dismiss the amended complaint.  (MTD (Dkt. # 39); MTD Reply (Dkt. # 50); Request (Dkt. # 41); Request Reply (Dkt. # 51); *see also* Am. Compl. (Dkt. # 38).)  Lead plaintiff Construction Laborers Pension Trust of Greater St. Louis (the "Pension Trust") and named plaintiff Paul Haddock (together, "Plaintiffs") oppose the motion.  (MTD Resp. (Dkt. # 47); *see also* Request Resp. (Dkt. # 46).)  The

1   court has considered the motion, the parties' submissions in support of and in opposition

2   to the motion, the applicable law, and the relevant portions of the record. Being fully

3   advised,[1] the court GRANTS Defendants' motion to dismiss.

## II.    BACKGROUND

Plaintiffs bring this putative securities fraud class action on behalf of investors

who purchased or otherwise acquired shares of Funko Class A common stock between

March 3, 2022, through March 1, 2023, inclusive (the "Proposed Class Period"). (*See*

Am. Compl. ¶¶ 1-2.) Plaintiffs allege that, during the Proposed Class Period, two of

Funko's former executive officers, Mr. Perlmutter (Chief Executive Officer ("CEO"))

and Ms. Jung (Chief Financial Officer ("CFO")), made "reckless and materially false and

misleading statements [and omissions] to investors concerning Funko's abysmal

execution of two highly touted infrastructure projects and its accumulation of excess and

obsolete inventory." (*Id.* ¶ 2.) Plaintiffs further allege that Defendants' conduct

artificially inflated the price of Funko's Class A stock, and when the true extent of

Funko's floundering business initiatives came to light, "the price of Funko Class A stock

significantly dropped," causing substantial losses to the putative class. (*Id.* ¶¶ 159-60.)

Below, the court sets forth the factual background as pleaded by Plaintiffs before

turning to the relevant procedural history.[2]

---

[1] No party requests oral argument (*see* MTD at 1; MTD Resp. at 1), and the court determines that oral argument would not aid in its disposition of the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

[2] Defendants request judicial notice of certain exhibits pursuant to Federal Rule of Evidence 201 and the incorporation by reference doctrine. (*See generally* Request.) Plaintiffs

## A.    Funko and its Business

Funko[3] is a publicly-traded company headquartered in Everett, Washington that designs, produces, and sells consumer pop culture products, "including vinyl figures, apparel and accessories, board games," and more, "using licensed pop culture content related to movies, TV shows, video games, musicians and sports teams." (*Id.* ¶ 27.) Funko is particularly well-known for its flagship collectible "FunkoPop!" vinyl figures, which depict stylized pop culture characters based on licensed content from various media companies like Disney, Marvel, and HBO, among others. (*Id.* ¶¶ 3, 32-33.)

Funko has an "extensive licensing portfolio" that "is critical to its business model." (*Id.* ¶ 37.) Some Funko products—like Star Wars Classic and Harry Potter—are "not tied to a new or current release" and thus "do not have a defined duration of market demand." (*Id.* ¶ 35.) Meanwhile, other Funko products "are intended to 'capitalize on the excitement of fans surrounding the launch of new content' and have a limited duration of market demand depending on how popular the content ultimately proves." (*Id.*) During the Proposed Class Period, Funko's licensing agreements typically granted it rights to use the licensor's intellectual property for a discrete time period in exchange

---

dispute only Exhibits 10 and 15. (*See* Request Resp. at 1.) The court agrees with the parties that Defendants' Exhibits 2 through 9, 11 through 14, and 16 through 18, are properly subject to judicial notice for the reasons explained in Defendants' briefing, and the court therefore takes judicial notice of these exhibits. (*See generally* McDonough Decl. (Dkt. # 40) ¶¶ 3-10, 12-15, 17-19 & Exs. 2-9, 11-14, 16-18.) The court addresses the disputed Exhibits 10 and 15 *infra*.

[3] Funko, Inc. is a holding company that was incorporated in 2017 for the purpose of completing an initial public offering in connection with Funko Acquisition Holdings LLC and its subsidiaries. (Am. Compl. ¶ 27.) Funko Acquisition Holdings LLC owns 100% of Funko, LLC, Funko's operating entity. (*Id.*) The court refers to these entities collectively as "Funko" for purposes of the instant motion.

for guaranteed minimum royalty payments.  (*Id.* ¶ 37.)  The contracts also provided "that the licensors owned the intellectual property rights in the products Funko designed and sold under the license, such that upon termination of those licenses, Funko no longer had the right to sell those products."  (*Id.* ¶ 38.)  Funko refers to products that it cannot sell due to expired licenses or lack of consumer demand as "dead" inventory.  (*Id.*)  In general, Funko's business model requires an ability "to quickly design, manufacture and ship" products, as well as "accurate demand forecasting and inventory management" to achieve optimal financial outcomes.  (*Id.* ¶¶ 40-41.)  Otherwise, the accumulation of excess dead inventory can cause Funko to lose revenue and miss financial targets.  (*Id.* ¶ 42.)  In 2019, for example, Funko was forced to write down $16.8 million in unsellable inventory that had accumulated in its Washington warehouses, leading to a stock price drop and subsequent securities fraud litigation that ultimately settled for $7 million.  (*Id.* ¶¶ 42, 155.)

In recent years, Funko has "invest[ed] significantly in upgraded infrastructure" to facilitate the company's "impressive growth trajectory."  (*Id.* ¶¶ 3-4.)  Two such projects lie at the core of Plaintiffs' claims in this case:  (1) the upgrade of Funko's enterprise resource planning ("ERP") software to Oracle, a more sophisticated platform (the "Oracle Project"); and (2) the relocation and consolidation of Funko's five Washington warehouses into a single "state-of-the-art" distribution center ("DC") in Buckeye, Arizona (the "Buckeye Project").  (*See id.* ¶¶ 4-21.)

//

//

**B.     The Projects and the Alleged Fraud**

In 2020, Funko decided to upgrade its ERP software from Microsoft NAV to Oracle.  (*Id.* ¶ 47.)  Funko's ERP system is the central information system and database that allows Funko to track its inventory and operations.  (*See id.* ¶¶ 4, 6, 45.)  Launching a new ERP system was a "massive endeavor" that was "manually intensive," and took longer than anticipated.  (*Id.* ¶¶ 48, 51.)  As Plaintiffs explain, "[i]n order for Oracle to be effective, Funko needed to 'clean' the Company's existing data so that it could be transferred to Oracle properly."  (*Id.* ¶ 50.)  But "Funko's data was a mess" due in large part to a lack of data governance, i.e., the "controls and processes for who creates certain data and how it should be entered into the system."  (*Id.* ¶ 51.)  Other issues hindered progress, too, including "deep rifts among Funko senior leadership," who "could not get 'aligned'" on "critical systems architecture decisions."  (*Id.* ¶ 53.)  By spring 2021, Chief Operating Officer ("COO") Joe Sansone stepped in, overseeing the project himself.  (*Id.* ¶ 48.)  By early 2022, however, "it was clear to employees across the Company's various departments that the Oracle project was far from being able to launch by" the targeted deadline of either "end of 2Q22 or early 3Q22."  (*Id.* ¶¶ 8, 54.)

Against this backdrop, Funko also endeavored to launch the Buckeye DC—a brand new 860,000 square foot facility that would house Funko's retail operations in the United States.  (*Id.* ¶¶ 55-57.)  Funko signed the Buckeye lease in September 2021 and began the lease term in April 2022.  (*Id.* ¶¶ 7, 57.)  "Funko planned for the Buckeye DC to operate on its new Oracle platform's warehouse management software" ("WMS"), which would employ "analytics and various inventory tracking tools to greatly enhance

the efficiency and productivity of Funko's order fulfillment and distribution operations."

(*Id.* ¶ 6.)  The Buckeye warehouse, however, was "a largely blank slate," requiring Funko

"to build out the needed storage racks, office space, loading bays, and even bathrooms."

(*Id.* ¶ 7.)  Funko would also have to ship the "substantial" amount of "inventory in its

Washington warehouses down to Buckeye," where the products would be processed,

organized, and stored.  (*Id.*)  In short, the Buckeye DC would require significant planning

and preparation to launch, and because it was intended to run on Oracle, its success was

intertwined with that of the Oracle Project.

On March 3, 2022—the first day of Plaintiffs' Proposed Class Period—

Defendants touted Funko's "exceptional revenue growth" in 2021 and offered optimistic

revenue projections for 2022, despite "higher-than-normal" Selling, General and

Administrative ("SG&A") expenses "due to the Oracle implementation and Buckeye DC

opening during the first half of the year."  (*Id.* ¶ 61.)  Meanwhile, Plaintiffs allege "it was

clear that the Company's infrastructure projects were nowhere close to being completed

(or their costs accrued) by the deadlines" that Defendants promised.  (*Id.* ¶ 64.)  Indeed,

the Buckeye DC was neither fully built nor fully staffed, and the Oracle WMS was not

yet ready for use.  (*Id.* ¶¶ 65-67.)

Nevertheless, Buckeye "opened" on April 4, 2022, and new employee training

started in late April.  (*Id.* ¶ 66.)  Trucks began arriving from Washington, though

Buckeye was "wholly unprepared for the onslaught of inventory"—including large

quantities of dead inventory that Funko's Vice President ("VP") of Operations had opted

to ship to Buckeye rather than discard.  (*Id.* ¶¶ 68-70, 76.)  Issues quickly ensued.  For

example, "none of the product was scanned in electronically so that its location [could]
be tracked within the enormous DC" (*id.* ¶ 70), and it became apparent that "trailers were
missing product, had extra product, or contained entirely different product" than expected
(*id.* ¶ 71). As storage racks filled up, inventory was strewn about the DC "without any
particular organization or identification." (*Id.* ¶ 75.) That Buckeye was operating on
Microsoft NAV rather than Oracle was also "causing major disruption," as "the
antiquated NAV system couldn't handle the workload of the new consolidated
warehouse" and "frequently experienced system errors." (*Id.* ¶¶ 73-74.) Consequently,
"order fulfillment began to get backed up." (*Id.* ¶ 75.)

On May 5, 2022, Defendants announced Funko's first quarter financial results.
(*Id.* ¶ 79.) Inventory levels were "up 160.8% over the prior year," which Defendants
explained was due in part to "pandemic-related supply chain disruptions." (*Id.*) Funko's
anticipated revenue margins remained consistent with the previous quarter, reflecting
"one-time project spend associated with" the Projects. (*Id.*) On an earnings call that day,
Ms. Jung remained optimistic about year-end financial projections, noting that SG&A
costs would be concentrated in the first half of the year as Buckeye had just launched and
Oracle was "set" to launch "at the end of the quarter." (*Id.* ¶ 80.)

Despite this sunny forecast, "[b]y June, the chaos at the Buckeye warehouse had
only increased." (*Id.* ¶ 84.) Oracle still had not launched, and Buckeye still was not fully
built out or properly staffed. (*Id.*) Mr. Sansone "began appearing at Buckeye regularly,
spending at least one or two weeks per month at the warehouse," having meetings with
senior management "about the DC and walking the floor speaking with warehouse

1   employees trying to solve immediate problems." (*Id.* ¶ 84.) "The chaos increased

2   exponentially at the end of the month, when shipping containers that had been held up in

3   transit during the COVID-19-related freight slowdowns and port delays . . . finally started

4   to arrive with additional inventory." (*Id.* ¶ 85.) Funko incurred rental charges and late

5   penalties for hundreds of shipping containers that began accumulating in the parking lot,

6   where they sat until space inside the DC became available to store the inventory. (*Id.*)

7   On August 4, 2022, Defendants announced Funko's second quarter financial

8   results. (*Id.* ¶ 86.) This included increased SG&A expenses and inventory levels

9   compared to the same quarter in 2021, reflecting Project-related costs and receipt of

10  delayed inventory at Buckeye. (*Id.*) Anticipated revenue margins remained steady,

11  though Funko also expected "personnel and related costs to remain elevated" through the

12  end of the year in connection with "the final transitions of our U.S. distribution

13  warehouses," as well as "elevated costs related to our [ERP] implementation" which

14  would be "finalize[d] in early 2023." (*Id.* ¶ 87.) On an earnings call the same day, Ms.

15  Jung confirmed that Funko had "recently made the difficult decision to delay" Oracle

16  implementation until 2023, so as not to impair existing "momentum." (*Id.* ¶ 88.)

17  Regarding inventory, Ms. Jung stated her belief that inventory was "generally high

18  quality" and that Funko was "well positioned to meet our consumer demand and support

19  our strong second half growth forecast." (*Id.* ¶ 89.) Following the earnings call, Funko's

20  Class A share price declined by $4.88, closing at $21.81 on August 5, 2022. (*Id.* ¶ 90.)

21  Back at Buckeye, the situation continued to devolve. By August, the DC was

22  more than 50 days behind in fulfilling backlogged orders. (*Id.* ¶ 91.) The DC was not

1    operating efficiently, with disorganized and overflowing inventory clogging the

2    warehouse, conveyer belt systems still under construction, and "constant battle[s]

3    between warehouse departments" to use what little equipment was available to reach

4    product on the top shelves.  (*Id.* ¶ 92.)  The lack of order fulfillment capabilities began

5    impacting forward sales.  (*Id.* ¶ 91.)  Sales team members struggled to meet quotas due to

6    missing product, "artificial product shortages arising from the inability to unload

7    containers," and order cancellations prompted by extreme shipping delays.  (*Id.* ¶ 93.)

8         On September 13, 2022, Defendants held a Funko Investor Day.  (*Id.* ¶ 94.)  Ms.

9    Jung touted Funko's strategy to meet optimistic revenue targets for 2026, representing

10   that the new DC and forthcoming Oracle launch would "provide increased operational

11   efficiencies."  (*Id.*)  When asked about future investments, Ms. Jung responded that

12   "more distribution capabilities" would be necessary to support continuing growth, but

13   that was "more of a future down the road within the 5-year plan, but not directly related

14   within the next, call it, 12 months or so."  (*Id.*)  Within weeks of Investor Day, however,

15   Funko hired a third-party logistics company to store slow-moving and dead inventory in a

16   warehouse.  (*Id.* ¶ 95.)  That warehouse filled to capacity within months, prompting

17   Funko to rent a second warehouse.  (*Id.*)

18        On November 3, 2022, Funko announced disappointing third quarter results,

19   revising its financial guidance for 2022 in stark contrast to the optimistic projections

20   made on Investor Day.  (*Id.* ¶ 97.)  Sales were up, but SG&A expenses remained elevated

21   and would grow even more in the fourth quarter, contributing to significantly reduced

22   revenue margins.  (*Id.* ¶¶ 97, 99.)  SG&A expenses reflected considerable labor costs and

1  costs related to third-party warehouse storage.  (*Id.* ¶ 99.)  Mr. Perlmutter admitted on the

2  ensuing earnings call that Buckeye had been designed to run on Oracle and that the

3  facility opened before it was ready.  (*Id.*)  Although inventory levels were high, Ms. Jung

4  remained steadfast that "inventory 'was generally high quality.'"  (*Id.* ¶ 100.)

5         Following the third quarter announcement, one analyst stated it felt "like we were

6  hit with a bomb."  (*Id.* ¶ 102.)  Funko's stock dropped 59%—closing at $7.92 per share

7  on November 4, 2022.  (*Id.* ¶ 103.)  On December 5, 2022, Funko announced leadership

8  changes.  (*Id.* ¶ 104.)  Mr. Perlmutter was demoted from CEO to President, and Ms. Jung

9  "stepp[ed] down" as CFO, effective immediately.  (*Id.*)

10        On March 1, 2023—the last day of the Proposed Class Period—Funko announced

11 its fourth quarter and year-end results for 2022.  (*Id.* ¶ 105.)  Net income and adjusted

12 revenue margins decreased substantially compared to the prior year.  (*Id.* ¶ 106.)  Funko

13 disclosed the decision to abandon the Oracle Project entirely, taking a $32.5 million write

14 down of associated costs.  (*Id.*)  Funko also disclosed its intention to eliminate and write

15 down between $30 million and $36 million in inventory in the first half of 2023.  (*Id.*)

16 Funko's Class A stock price closed at $9.94 per share on March 2, 2023, down from a

17 prior day close of $10.70.

18 **C.    Procedural History**

19        Former named plaintiff Jonathan Studen filed the original putative class action

20 complaint in this matter on June 2, 2023.  (*See generally* Compl. (Dkt. # 1).)  Mr. Studen

21 issued notice to the putative class pursuant to the Private Securities Litigation Reform

22 Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*  (6/27/23 Order (Dkt. # 5) at 2.)  On

1    August 1, 2023, Mr. Studen, the Pension Trust, and Mr. Haddock filed motions seeking

2    appointment as lead plaintiff.  (*See generally* Studen Mot. (Dkt. # 20); Pension Mot.

3    (Dkt. # 22); Haddock Mot. (Dkt. # 24).)  Mr. Studen and Mr. Haddock are individual

4    class members, and the Pension Trust "is a multi-employer defined pension plan with

5    approximately $1 billion in assets under management," including Funko Class A stock.

6    (Am. Compl. ¶¶ 25-26; Compl. ¶ 18.)  The court granted the Pension Trust's motion and

7    appointed it as lead plaintiff on August 17, 2023.  (8/17/23 Order (Dkt. # 29).)

8            The Pension Trust timely filed the amended complaint on October 19, 2023,

9    asserting claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act

10   of 1934 (the "1934 Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17

11   C.F.R. § 240.10b-5.[4]  (Am. Compl. ¶¶ 190-204.)  In the amended complaint, Plaintiffs

12   allege the Executive Defendants were deeply involved in the Projects; knew, or were at

13   least deliberately reckless, about the flailing infrastructure initiatives; and fraudulently

14   concealed the truth from investors.  (*See id.* ¶ 2.)  Specifically, Plaintiffs identify 28

15   allegedly false or misleading statements made by Defendants throughout the Proposed

16   Class Period, claiming these statements misled investors about the extent of the chaos

17   unfolding at Buckeye, the health of Funko's inventory, the status of the Oracle Project,

18   and Funko's overall financial outlook.  (*See id.* ¶¶ 114-146.)  Defendants timely moved to

19   //

20

21          [4]  The amended complaint does not name Mr. Studen.  (*See generally* Am. Compl.)
     Therefore, the court directs the parties to state whether they object to amending the caption of

22   this matter to name the Pension Trust and Mr. Haddock as Plaintiffs.  (*See infra* Part IV.)

1    dismiss the amended complaint, and the motion is now ripe for decision.  (*See generally*

2    MTD.)

3                                    **III.    ANALYSIS**

4          The court sets forth the relevant legal standard before addressing certain threshold

5    procedural matters and then, the merits.

6    **A.    Legal Standard**

7          To survive a motion to dismiss, a plaintiff must plead "enough facts to state a

8    claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

9    544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement

10   of the claim showing that the pleader is entitled to relief").  The court must accept all

11   factual allegations in the complaint as true and construe the pleadings in the light most

12   favorable to the plaintiff, but it need not "accept as true allegations that contradict matters

13   properly subject to judicial notice or by exhibit," or "allegations that are merely

14   conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead*

15   *Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

16         Securities fraud claims must also meet the more "exacting" pleading requirements

17   of Federal Rule of Civil Procedure 9(b) and the PSLRA.  *Or. Pub. Emps. Ret. Fund v.*

18   *Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).  Rule 9(b) requires a plaintiff to

19   "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

20   "That is, the complaint must allege the 'who, what, when, where, and how' of the fraud."

21   *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (quoting *Vess*

22   *v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  Under the PSLRA, a

1   complaint must "specify each statement alleged to have been misleading, the reason or

2   reasons why the statement is misleading, and, if an allegation regarding the statement or

3   omission is made on information and belief, the complaint shall state with particularity all

4   facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1)(B), and the complaint must

5   also "state with particularity facts giving rise to a strong inference that the defendant

6   acted with the required state of mind," *id.* § 78u-4(b)(2)(A).  *See id.* § 78u-4(b)(3)(A)

7   (mandating dismissal on defendant's motion where the complaint fails to meet these

8   requirements).

9   **B.    Preliminary Matters**

10          Before examining the merits, the court must address threshold procedural matters.

11          First, Plaintiffs move to strike Defendants' Appendix A, asserting it is

12   argumentative and an improper attempt to bypass applicable word limits.  (MTD Resp. at

13   7; *see also* McDonough Decl. ¶ 2, Ex. 1 ("Appendix A")); Local Rules W.D. Wash. LCR

14   7(e)(3) (imposing 8,400-word limit on motions to dismiss).  Appendix A is a chart

15   created by Defendants that identifies (1) the 28 allegedly fraudulent statements at issue,

16   (2) additional text "denot[ing] surrounding context that is omitted from the [amended

17   complaint]," and (3) citations to Defendants' arguments, as set forth in their motion to

18   dismiss, with respect to each challenged statement.  (Appendix A at 1.)  Plaintiffs ask the

19   court to consider their responsive chart should it decline to strike Appendix A.  (MTD

20   Resp. at 7; *see also id.* at Ex. A ("Responsive Chart").)  The court agrees with Defendants

21   that Appendix A comprises "organizational work that the Court would otherwise have to

22   take upon itself," and therefore declines to strike it.  (MTD Reply at 2 (quoting *Waswick*

*v. Torrid Holdings, Inc.*, No. 2:22-cv-08375-JLS-AS, 2023 WL 9197563, at \*3 (C.D. Cal. Dec. 1, 2023)).)  The court will consider both Defendants' Appendix A and Plaintiffs' Responsive Chart.

Second, Defendants ask the court to judicially notice their Exhibits 10 and 15 pursuant to Federal Rule of Evidence 201.  (Request at 3); *see also* Fed. R. Evid. 201(b)(1)-(2) (authorizing judicial notice of adjudicative facts that are "not subject to reasonable dispute" and (1) are generally known within the court's jurisdiction, or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  Exhibit 10 is Funko's Form 8-K, filed with the Securities and Exchange Commission ("SEC") on December 5, 2022.  (*See generally* McDonough Decl. ¶ 11, Ex. 10.)  Exhibit 15 "is a PowerPoint slide deck that Defendants displayed and referred to during a September 13, 2022 'Analyst/Investor Day' conference," and "is publicly available on Funko's website."  (Request at 4.  *See generally* McDonough Decl. ¶ 16, Ex. 15 ("Investor Day Deck").)  Plaintiffs oppose Defendants' request, arguing the exhibits at issue "are subject to reasonable dispute" and that it would be improper to accept their contents as true.  (Request Resp. at 4.)

Under Federal Rule of Evidence 201(b), courts may take judicial notice of publicly available documents "introduced to 'indicate what was in the public realm at the time, not whether the contents of those [documents] were in fact true.'"  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Premier Growth Fund v. All. Cap. Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)).  Accordingly, the court will take judicial notice of Exhibits 10 and 15 not for the truth of

1    their contents, but for the narrow purpose of considering the representations made and

2    information available to investors during the Proposed Class Period.  *See, e.g.*, *In re*

3    *Zillow Grp., Inc. Sec. Litig.*, No. C17-1387JCC, 2018 WL 4735711, at *3 (W.D. Wash.

4    Oct. 2, 2018) (taking "judicial notice of the fact that Zillow filed the June 2018 Form

5    8-K, as well as of that document's contents," but declining to accept the form's contents

6    as true); *Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 WL 7261314, at *7 (N.D.

7    Cal. Dec. 10, 2020) (taking judicial notice of public documents including "transcripts

8    from earnings calls, investor and analyst conferences, and related presentations . . . 'for

9    the sole purpose of determining what representations [Defendants] made to the market'"

10   (quoting *Wochos v. Tesla, Inc.*, No. 17-cv-05828-CRB, 2018 WL 4076437, at *2 (N.D.

11   Cal. Aug. 27, 2018))).

12           The court now turns to the merits.

13   **C.    Plaintiffs' Claims Under Section 10(b)**

14           Section 10(b) of the 1934 Exchange Act makes it unlawful for "any person . . . [t]o

15   use or employ, in connection with the purchase or sale of any security registered on a

16   national securities exchange . . . any manipulative or deceptive device or contrivance in

17   contravention of such rules and regulations as the [SEC] may prescribe as necessary or

18   appropriate in the public interest or for the protection of investors."  15 U.S.C.

19   § 78j(b).  "Rule 10b-5 implements Section 10(b) by making it unlawful '[t]o make any

20   untrue statement of a material fact or to omit to state a material fact necessary in order to

21   make the statements made, in the light of the circumstances under which they were made,

22   not misleading.'"  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764

1  (9th Cir. 2023) (quoting 17 C.F.R. § 240.10b-5(b)).  To state a claim for securities fraud

2  under Section 10(b) and Rule 10b-5, a plaintiff must allege:  (1) a material

3  misrepresentation or omission in connection with the purchase or sale of a security (i.e.,

4  falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the

5  purchase or sale of a security; (4) reliance upon the misrepresentation or omission;

6  (5) economic loss; and (6) loss causation.  *Id.*

7        Here, the parties dispute only falsity and scienter.  The court addresses each

8  element in turn, explaining why neither is met.

9        1.  Falsity

10       Section 10(b) and Rule 10b-5 require a plaintiff to show that the defendant made a

11  statement that was false or misleading as to a material fact.  *Basic Inc. v. Levinson*, 485

12  U.S. 224, 238 (1988).  A statement is false or misleading if it directly contradicts what

13  the defendant knew at the time or omits material information.  *Weston Fam. P'ship LLLP*

14  *v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).  Plaintiffs "may rely on either an

15  affirmative misrepresentation theory or an omission theory."  *Wochos v. Tesla*, 985 F.3d

16  1180, 1188 (9th Cir. 2021).  "'[A]n affirmative misrepresentation is an untrue statement

17  of a material fact,' and a fraudulent omission is a failure to 'state a material fact

18  necessary in order to make the statements made, in light of the circumstances under

19  which they were made, not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

20  "Courts apply the objective standard of a 'reasonable investor' to determine whether a

21  statement is misleading."  *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 932 (N.D.

22  Cal. 2022) (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993)).  A

1    "statement is misleading if it would give a reasonable investor the impression of a state of

2    affairs that differs in a material way from the one that actually exists."  *In re Cutera Sec.*

3    *Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (quoting *Berson v. Applied Signal Tech., Inc.*,

4    527 F.3d 982, 985 (9th Cir. 2008)).

5         Certain types of statements are not actionable for securities fraud.  Relevant here,

6    the PSLRA carves out a "safe harbor for forward-looking statements."  15 U.S.C.

7    § 78u-5; *see also id.* § 78u-5(i)(1) (defining "forward-looking" statements as including

8    those that concern financial projections, future economic performance, and the plans and

9    objectives of management for future operations).  The safe harbor "'is designed to protect

10   companies and their officials' when they merely fall short of their 'optimistic

11   projections.'"  *Wochos*, 985 F.3d at 1189 (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865

12   F.3d 1130, 1142 (9th Cir. 2017)).  The safe harbor shields two types of forward-looking

13   statements.  It first protects forward-looking statements that are (1) identified as such, and

14   (2) "accompanied by meaningful cautionary statements identifying important factors that

15   could cause actual results to differ materially from those in the forward-looking

16   statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  The safe harbor also protects

17   forward-looking statements "not identified and not accompanied by cautionary language,

18   unless they were 'made with actual knowledge . . . that [they were] false or misleading.'"

19   *Cutera*, 610 F.3d at 1108 (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii)).

20        In general, pure statements of honest opinion also are not actionable.  *Wochos*, 985

21   F.3d at 1189.  There are only three circumstances in which an opinion statement may be

22   actionable:  where (1) the speaker did not actually hold the stated belief, (2) the opinion

1   contains an embedded statement of untrue fact, or (3) a reasonable investor would

2   "understand an opinion statement to convey facts . . . about the speaker's basis for

3   holding that view," but those facts are untrue.  *Id.* (quoting *Omnicare, Inc. v. Laborers*

4   *Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015)).  The third category

5   captures opinions that are "misleading by omission."  *In re Atossa Genetics Inc. Sec.*

6   *Litig.*, 868 F.3d 784, 802 (9th Cir. 2017).  "[F]or an opinion to be misleading by

7   omission, (1) the 'statement [must] omit[] material facts about the [defendant's] inquiry

8   into or knowledge concerning a statement of opinion,' and (2) 'those facts [must] conflict

9   with what a reasonable investor would take from the statement itself.'"  *Id.* (quoting *City*

10   *of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605,

11   615 (9th Cir. 2017)).

12         "Puffery" statements likewise are not actionable.  *Macomb Cnty. Emps.' Ret. Sys.*

13   *v. Align Tech., Inc.*, 39 F.4th 1092, 1098 (9th Cir. 2022).  "Corporate 'puffing' involves

14   'expressing an opinion' that is not 'capable of objective verification.'"  *Id.* at 1098-99

15   (quoting *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard*

16   *Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)).  "These 'vague statements of optimism like

17   "good," "well-regarded," or other feel good monikers, are not actionable because

18   professional investors, and most amateur investors as well, know how to devalue the

19   optimism of corporate executives.'"  *Id.* at 1099 (quoting *Police Ret. Sys. of St. Louis v.*

20   *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014)).  Puffery "statements rise to

21   the level of materially misleading statements," and thus may be actionable, "only if they

22   provide 'concrete description of the past and present' that affirmatively create a plausibly

1   misleading impression of a 'state of affairs that differed in a material way from the one

2   that actually existed.'"  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021)

3   (quoting *Quality Sys.*, 865 F.3d at 1144).

4        With these principles in mind, the court now turns to the challenged statements,

5   addressing them in groups.  Defendants argue that Plaintiffs fail to establish falsity

6   because the challenged statements either are not false or misleading, or are protected

7   forward-looking statements, opinions, or puffery.  Although Defendants are not correct

8   on every account, the court generally agrees.

9        *a.  Risk Disclosures*

10       First, Plaintiffs challenge six "Risk Factors" contained within public SEC filings

11  that Funko issued throughout 2022.  (*See* Am. Compl. ¶¶ 114, 122-23, 128-29, 143.)  The

12  court concludes that none are actionable.

13       Four of the challenged risk disclosures identify potential risks in connection with

14  inventory management.  (*See id.* ¶¶ 114, 123, 128, 143.)  These disclosures are identical

15  to one another and were issued on March 3, 2022, May 5, 2022, August 4, 2022, and

16  November 3, 2022.  They state as follows:

17       Our success depends, in part, on our ability to successfully manage our
         inventories.  . . .  If demand or future sales do not reach forecasted levels, we
18       could have excess inventory that we may need to hold for a long period of
         time, write down, sell at prices lower than expected or discard.  . . .  If we are
19       not successful in managing our inventory, our business, financial condition
         and results of operations could be adversely affected.
20
     (McDonough Decl. ¶ 14, Ex. 13 ("21 Form 10-K") at 27; *id.* ¶ 17, Ex. 16 ("1Q22 Form
21
     10-Q") at 42; *id.* ¶ 18, Ex. 17 ("2Q22 Form 10-Q") at 49; *id.* ¶ 19, Ex. 18 ("3Q22 Form
22

10-Q") at 46.)  Two additional disclosures concern Funko's ERP systems.  (*See* Am.

Compl. ¶¶ 122, 129.)  These disclosures are largely identical to one another and were

issued on May 5, 2022, and August 4, 2022.  They state as follows:

> The failure of these information systems to perform as designed, our failure
> to operate them effectively, or a security breach or disruption in operation of
> our information systems could disrupt our business . . . .  If the potential
> upgrades are not successful or result in [further[5]] delays, our business could
> be disrupted or harmed.

(1Q22 Form 10-Q at 57; 2Q22 Form 10-Q at 64.)

Defendants argue these risk disclosures receive safe harbor protection under 15

U.S.C. § 78u-5(c)(1)(A)(i) because they are forward-looking, identified as such, and

accompanied by meaningful cautionary language.  (MTD at 8-9.)  The court agrees with

Defendants that the risk disclosures are forward-looking "to the extent that they describe

the future challenges [Funko] might confront."  *Wochos*, 985 F.3d at 1195.  But the

disclosures are not *identified* as forward-looking.  On this point, Funko's public SEC

filings contradict Defendants' argument because the filings identify the challenged risk

disclosures separately from Funko's forward-looking statements concerning financial or

operational projections.  (*See, e.g.*, 1Q22 Form 10-Q at 1 ("These forward-looking

statements are subject to a number of risks, uncertainties, and assumptions,

including . . . 'Risk Factors' . . . that may cause our actual results, performance or

achievements to differ materially and adversely from those expressed or implied by the

//

---

[5] The word "further" appears in the second quarter disclosure issued on August 4, 2022,
but not the first quarter disclosure issued on May 5, 2022.

1  forward-looking statements.").)  Accordingly, the risk disclosures are not protected by the

2  PSLRA safe harbor under 15 U.S.C. § 78u-5(c)(1)(A)(i).

3        Plaintiffs argue that the disclosures are false or misleading because they describe

4  risks that "had *already materialized*." (*E.g.*, Am. Compl. ¶ 138(a).  *See also* MTD Resp.

5  at 16-17.)  Plaintiffs are correct that in some instances, falsity allegations respecting risk

6  disclosures may suffice where "a company's SEC filings warned that risks 'could' occur

7  when, in fact, those risks had already materialized." *In re Facebook, Inc. Sec. Litig.*, 87

8  F.4th 934, 948-49 (9th Cir. 2023); *Alphabet*, 1 F.4th at 703-04; *see also Glazer*, 63 F.4th

9  at 780-81 (stating that the risk need not have become an absolute certainty to mislead,

10 and that defendants' awareness "of a significant likelihood that the risk would

11 materialize" suffices).  Importantly, *Facebook* and *Alphabet* instruct that plaintiffs

12 challenging risk disclosures can successfully plead falsity only where their allegations

13 show the defendants "*knew* that those risks had materialized." *Alphabet*, 1 F.4th at 704

14 (emphasis added) (holding plaintiffs adequately pled falsity with respect to disclosures

15 identifying potential security risks, because the disclosures failed to mention an existing

16 privacy bug of which Google executives were allegedly aware as they had "received and

17 read" a legal memo detailing the issue); *see also Facebook*, 87 F.4th at 948 (holding

18 plaintiffs adequately pled falsity with respect to disclosures concerning potential security

19 risks, based on numerous particularized allegations that Facebook executives knew of

20 existing data violations by Cambridge Analytica).  Conversely, where "the plaintiff fails

21 to prove" forward-looking statements were "made with actual knowledge that [they were]

22 //

1    false or misleading," those statements are entitled to safe harbor protection under the

2    PSLRA.  *See* 15 U.S.C. § 78u-5(c)(1)(B); (*see also* MTD at 11-13.)

3          Having determined that the challenged risk disclosures are forward-looking, *see*

4    *supra*, the court's analysis thus turns on Defendants' knowledge:  Plaintiffs meet the

5    falsity requirement if they plausibly allege Defendants knew the stated risks had already

6    transpired or were substantially likely to occur at the time they disclosed those risks as

7    possibilities, *e.g.*, *Alphabet*, 1 F.4th at 704, but the disclosures receive safe harbor

8    protection if Plaintiffs fail to plausibly allege Defendants' actual knowledge of the same,

9    15 U.S.C. § 78u-5(c)(1)(B).  For the reasons explained below, Plaintiffs' challenges to

10   Defendants' risk disclosures fail.

11                      i.    Inventory-Related Disclosures

12         As noted, four challenged risk disclosures warned of possible risks in connection

13   with inventory management—specifically, that Funko "could have excess inventory that

14   [it] may need to hold for a long period of time, write down, sell at prices lower than

15   expected or discard."  (*E.g.*, Am. Compl. ¶ 114.)  Plaintiffs, however, fail to offer

16   particularized allegations demonstrating the Executive Defendants knew at the time of

17   the disclosures that the stated risks had materialized or were substantially likely to occur.

18         Plaintiffs come somewhat close by alleging that Mr. Sansone, Funko's COO,

19   "began appearing at Buckeye regularly" in June 2022, "spending at least one or two

20   weeks per month at the warehouse, having meetings . . . about the DC and walking the

21   floor speaking with warehouse employees trying to solve immediate problems."  (*Id.*

22   ¶¶ 84, 149.)  At this time, the Buckeye DC was allegedly in "chaos" due to staffing

issues, significant quantities of missing or misplaced inventory "with no Oracle system to assist with keeping track of" it, a "substantial amount of non-moving and dead inventory," and an influx of additional inventory "arriving en masse" with nowhere to store it, as "the existing racks in the Buckeye DC were already full." (*Id.* ¶¶ 84-85.)  As many as 300 to 500 shipping containers sat unloaded in the parking lot on any given day, accruing rental charges and late penalties. (*Id.* ¶ 85.)  Plaintiffs assert that as a result, "[e]ven a casual observer at Buckeye could tell that the DC was over capacity and not able to operate with even close to the necessary productivity." (*Id.* ¶ 152.)  Viewing these allegations in the light most favorable to Plaintiffs leads to an inference that Mr. Sansone knew of excess inventory issues that were openly escalating at Buckeye.  But Plaintiffs fail to connect the dots.  Absent from the amended complaint are particularized allegations showing the Executive Defendants had regular conversations, debates, and meetings with Mr. Sansone that specifically concerned these excess inventory issues.  Plaintiffs also fail to allege the specific contents of any such conversation.  Instead, Plaintiffs allege in conclusory fashion that "[u]ndoubtedly, Sansone reported back to Perlmutter, and most likely to Fall Jung, what he was seeing" at Buckeye. (*Id.* ¶ 152.)  That falls short of the demanding PSLRA standard.

Plaintiffs also suggest the Executive Defendants knew about excess inventory issues at Buckeye because (1) they participated in regular meetings "to discuss Sales forecasts and available inventory, as well as what inventory was not selling," (2) Ms. "Jung's group had responsibility for accounting for Funko's inventory levels," (3) Defendants stated they were "constantly" and "always" looking at inventory health,

1   and (4) Mr. "Perlmutter himself visited the Buckeye DC" some unidentified time "during

2   3Q22." (*Id.* ¶¶ 148, 152.)  These allegations are not sufficiently particular to plead the

3   Executive Defendants' actual knowledge under the heightened standards imposed by the

4   PSLRA.  For example, Plaintiffs do not specify when or how often the sales meetings

5   took place—"regular" could mean once per week, month, year, or anywhere in between.

6   Vague allegations that these meetings addressed "forecasts," "available inventory," and

7   "inventory [that] was not selling" do not demonstrate whether the Executive Defendants

8   received specific details about the precise quantity and value of inventory that was

9   obsolete, or how long Funko had been holding obsolete inventory.  Nor does the amended

10  complaint reveal the date or length of Mr. Perlmutter's visit, the purpose of the visit,

11  whether he interacted with employees during that visit, or any other alleged facts that

12  would tend to show Mr. Perlmutter witnessed and appreciated the extent of excess

13  inventory issues at Buckeye.

14          On the whole, Plaintiffs' generalized allegations fail to plausibly show the

15  Executive Defendants knew that Funko was holding excess product for a long period of

16  time, writing down excess product, or discarding excess product—the specific risks that

17  the inventory-related disclosures warned of.  *See Ferreira v. Funko Inc.*, No.

18  2:20-cv-02139-VAP (PJWx), 2021 WL 8820650, at *15-20 (C.D. Cal. Oct. 22, 2021)

19  (holding, in prior securities fraud action against Funko, that identical inventory risk

20  disclosure dated August 8, 2019, was not misleading because plaintiffs failed to plead

21  particularized facts showing it was issued with actual knowledge of falsity).  *Cf. id.* at

22  *20-22 (holding, in same case, that identical inventory risk disclosure dated October 31,

2019 was misleading because defendants allegedly issued it after (1) discussing

approximately 13 weekly "aged inventory report[s]" that "set forth exactly what

inventory Funko held, including how much was obsolete and slated for destruction, as

well as its monetary value"; (2) repeatedly discussing an "Open to Buy plan" that detailed

"the present amount of inventory, excess inventory, the estimated cost of sale of the

inventory, and . . . a line item called 'write-down,' indicating how much of the inventory

was obsolete," and (3) being told that Funko had leased a warehouse to store dead

inventory that would be destroyed).  Thus, these four disclosures come within the PSLRA

safe harbor, 15 U.S.C. § 78u-5(c)(1)(B), and are not actionable.  (*See* Am. Compl.

¶¶ 114, 123, 128, 143.)

ii.   ERP-Related Disclosures

The remaining two disclosures warned of possible risks in connection with ERP

implementation.  Consistent with Plaintiffs' briefing, the court focuses its inquiry on the

specific risk of "delays in the ERP system upgrades" and whether the Executive

Defendants actually knew a delay was certain or substantially likely to occur when they

disclosed it as a mere possibility on May 5, 2022, and August 4, 2022.  (MTD Resp. at

17.)

To begin, the court notes a critical difference between these two disclosures.

Defendants revised the latter disclosure to inform shareholders of Funko's decision to

"delay[] the remaining steps for implementation of our enterprise resource planning

software to 2023."  (2Q22 Form 10-Q at 64 (warning of possible risks in connection with

"further" delays); *see also* 2Q22 Call Tr. at 6 (Ms. Jung advising on same day earnings

1  call that "[r]egarding our ERP, we recently made the difficult decision to delay the

2  remaining steps until 2023").)  The court cannot draw the inference that the August 4,

3  2022 disclosure was misleading when it expressly advised that certain risks related to the

4  Oracle Project had indeed come to pass.  Rather than creating "the impression of a state

5  of affairs that differ[ed] in a material way from the one that actually exist[ed]," the

6  disclosure candidly informed investors that Oracle would not timely launch.  *Cutera*, 610

7  F.3d at 1109.  *Cf. Glazer*, 63 F.4th at 780-81 (holding disclosure with mere "boilerplate

8  listing of generic risks" was misleading where defendants "did not meaningfully update

9  the risk disclosure" after learning new information that made the risk significantly more

10  likely to occur).  Plaintiffs therefore fail to plausibly allege falsity as to the ERP-related

11  risk disclosure issued on August 4, 2022.  (*See* Am. Compl. ¶ 129.)

12      Turning now to the first quarter disclosure, the court concludes Plaintiffs fare no

13  better because they fail to plausibly allege the Executive Defendants actually knew by

14  May 5, 2022, that a delay of the Oracle launch was certain or substantially likely to

15  occur.

16      According to Plaintiffs, the new ERP system could not have possibly launched by

17  "by the end of 2Q22 or early 3Q22" as planned, for two principal reasons:  (1) Funko's

18  data was a "mess" without "data governance" controls, resulting in a "manually

19  intensive" implementation process that required significant institutional resources and

20  knowledge, both of which were lacking; and (2) corporate infighting hindered progress

21  because "[t]he C-Suite simply could not get 'aligned' as to . . . critical systems

22  architecture decisions."  (*Id.* ¶¶ 8, 51-53.)  As a result of these problems, "[b]y early

1   2022, it was clear to employees across [Funko]'s various departments that the Oracle

2   project was far from being able to launch by [Funko]'s targeted" deadline.  (*Id.* ¶ 54.)

3   Plaintiffs argue the Executive Defendants must have known this, too, as they were

4   personally involved in the Oracle Project.  (*See* MTD Resp. at 2, 21.)  Specifically, both

5   Ms. Jung and Mr. Perlmutter participated in "bi-weekly 'Steering Committee' leadership

6   meetings" in which "all of the C-Suite individuals" discussed critical "decisions as to

7   how the [ERP] system should be set up."  (*Id.* ¶ 53.)  Mr. Sansone—who personally

8   oversaw the Oracle Project—also attended these meetings, which had been ongoing since

9   2021.  (*Id.* ¶¶ 48, 53, 149.)  Ms. Jung in particular "debated various aspects of the Oracle

10  project" with Mr. Sansone at the biweekly meetings, and the two were "constantly at

11  odds with one another" like "oil and water."  (*Id.* ¶¶ 53, 149.)  In addition, "status reports

12  about the project [were] emailed to executives following" each biweekly meeting (*id.*),

13  and these reports "discuss[ed] the ongoing problems that needed to be dealt with (but

14  weren't being dealt with) prior to" the targeted launch deadline (*id.* ¶ 64).  Mr.

15  Perlmutter, for his part, "had conversations with the Oracle implementation team

16  regarding the difficulty they were having obtaining necessary information and decisions,

17  as well as the lack of leadership alignment on the project."  (*Id.* ¶ 149.)

18          These allegations suggest the Executive Defendants likely should have known that

19  the targeted launch date was not feasible, but they do not allege with particularity that the

20  Executive Defendants *actually* knew that a delay was certain or substantially likely to

21  occur.  Plaintiffs speak only in generalities, failing to explain "the who, what, when,

22  where, and how of the fraud."  *Khoja*, 899 F.3d at 1008 (internal quotation marks

1   omitted).  The vague allegation, for example, that the C-Suite "could not get 'aligned'" as

2   to "critical systems architecture decisions" (Am. Compl. ¶ 53) does not reveal what those

3   decisions were, how many were outstanding, how they were critical, or by when they

4   needed to be made to ensure a timely ERP launch.  Without more, it is difficult to

5   understand the significance of these decisions, how they allegedly affected the project

6   timeline, or whether certain outstanding decisions would have signaled to the Executive

7   Defendants by May 5, 2022, that Oracle could not timely launch.  Moreover, general

8   allegations that the Executive Defendants attended biweekly meetings and received status

9   reports about unspecified "ongoing problems" (*id.* ¶ 64) do not establish with

10  particularity that the Executive Defendants received information about the specific

11  reasons that made the target launch date impossible or highly improbable.  At no point do

12  Plaintiffs allege the Executive Defendants received status reports that specifically

13  concerned data-related problems, or the overall progress of Funko's data transfer, for

14  instance.  (*See generally id.*)  Similarly, although Mr. Perlmutter allegedly "had

15  conversations with the Oracle implementation team" about "difficult[ies] they were

16  having" (*id.* ¶ 149), Plaintiffs do not specify the date(s) or number of conversations, the

17  participants, nor the specific contents of any such conversation.  Even when taking the

18  allegations all together in the light most favorable to Plaintiffs, Plaintiffs fail to plead the

19  Executive Defendants' actual knowledge with the particularity required by the PSLRA.

20      In sum, Plaintiffs' challenges to Defendants' risk disclosures fail.  With respect to

21  the revised August 4, 2022 risk disclosure that expressly informed shareholders of the

22  Oracle delay, the court concludes that Plaintiffs fail to plead falsity.  (*See* Am. Compl.

1    ¶ 129.)  With respect to the remaining risk disclosures, the amended complaint lacks

2    particularized allegations showing the Executive Defendants knew the stated risks had

3    materialized or were substantially likely to occur when the disclosures were made.  The

4    disclosures are entitled to safe harbor protection under 15 U.S.C. § 78u-5(c)(1)(b).[6]  (*Id.*

5    ¶¶ 114, 122-23, 128, 143.)  Plaintiffs' claims as to all of the challenged risk disclosures

6    are therefore dismissed.

7             *b.  Forward-Looking Statements*

8             Next, ten more of the challenged statements are not actionable because they come

9    within the PSLRA safe harbor for forward-looking statements that are identified as such

10   and accompanied by meaningful cautionary language, 15 U.S.C. § 78u-5(c)(1)(A)(i).

11   (*See* Am. Compl. ¶¶ 115, 117-18, 120-21, 124-26, 130, 141.)

12            These statements are forward-looking because they concern financial projections

13   or the plans and objectives for future operations, or because they state assumptions

14   underlying the same.  15 U.S.C. § 78u-5(i)(1)(A)-(B), (D).  For example, Plaintiffs

15   challenge mere predictions that "SG&A as a percent of sales is [] expected to be slightly

16   higher in the first half of" 2022 (Am. Compl. ¶ 115 (quoting McDonough Decl. ¶ 4, Ex. 3

17   ("4Q21 Form 8-K") at 8)); that Funko's "full year 2022 financial results" would reflect

18   "[a]djusted EBITDA margin of approximately 14.6% at the midpoint of our revenue

19

20            _____

21            [6]  For the reasons explained *infra* § III(C)(2)(a), Plaintiffs' scienter allegations—
     including those concerning the core operations doctrine—do not aid in plausibly alleging the
     Executive Defendants' actual knowledge.  *See Glazer*, 63 F.4th at 766 (stating that, although
22   falsity and scienter are separate inquiries subject to different standards of plausibility, "some
     facts might be used to support both an inference of scienter and an inference of falsity").

1   range" due to "approximately 80 bps of headwind from one-time project spend" (*id.*

2   ¶ 120 (quoting McDonough Decl. ¶ 15, Ex. 14 ("1Q22 Form 8-K") at 8)); and that "down

3   the road," Funko would need "more distribution capabilities to continue [to] support the

4   growth, but that's more of a future down the road within the 5-year plan, but not directly

5   related within the next, call it, 12 months or so" (*id.* ¶ 141 (quoting McDonough Decl.

6   ¶ 8, Ex. 7 ("Investor Day Tr.") at 28)).  These statements plainly are forward-looking in

7   that they describe financial and operational expectations for the future.  In addition, all

8   ten of these forward-looking statements are identified as such, 15 U.S.C.

9   § 78u-5(i)(1)(A)(i).  (*See, e.g.*, 4Q21 Form 8-K at 9; Investor Day Deck at 2; 1Q22 Form

10  8-K at 9.)

11          To the extent Plaintiffs argue that some of these forward-looking statements

12  address "current fact" (*see* MTD Resp. at 13, 15), this "mixed"-statement argument fails

13  under *Wochos*.  A "mixed" statement may be actionable only where the allegations "show

14  that the statement goes *beyond* the articulation of 'plans,' 'objectives,' and 'assumptions'

15  and instead contains an express or implied 'concrete' assertion concerning a specific

16  'current or past fact[].'"  *Wochos*, 985 F.3d at 1191 (quoting *Quality Sys.*, 865 F.3d at

17  1142, 1144).  By contrast, mere "assumptions incorporated into a projection" and

18  "statements reaffirming an objective are themselves forward-looking under the PSLRA."

19  (MTD Reply at 2-3 (citing *Wochos*, 985 F.3d at 1192).)  Defendants' May 5, 2022

20  statements that "[w]e remain on track to deliver full year adjusted EBITDA margins,"

21  (Am. Compl. ¶ 124 (quoting McDonough Decl. ¶ 5, Ex. 4 ("1Q22 Call Tr.") at 8)), and

22  that "ERP is set to come out at the end of the quarter," (*id.* ¶ 125 (quoting McDonough

1   Decl. ¶ 5, Ex. 4 ("1Q22 Call Tr.") at 9)), are protected as mere "'assumptions' about

2   future events on which" Defendants' financial and operational projections are based.

3   *Wochos*, 985 F.3d at 1192 ("Like the goal itself, such projected timelines are

4   forward-looking statements."); *see also* 15 U.S.C. § 78u-5(i)(1)(D).[7]

5          The next, more difficult question is whether these forward-looking statements are

6   accompanied by meaningful cautionary language.  Defendants point to several

7   paragraphs of cautionary language that they assert is meaningful, including the risk

8   disclosures discussed *supra*.  (*See generally* Appendix A.)  Plaintiffs argue this language

9   is not meaningful because it warns of risks that had already materialized.  (*See* MTD

10  Resp. at 17.)  The court agrees with Defendants.

11          "To be 'meaningful,' the cautionary language must 'identify[] important factors

12  that could cause actual results to differ.'"  *Glazer*, 63 F.4th at 780 (quoting 15 U.S.C.

13  § 78u-5(c)(1)(A)(i)).  Relevant here, the Ninth Circuit has extended the logic of *Alphabet*

14  to the instant "context of the safe harbor," holding that "cautionary language is not

15  'meaningful' if it discusses as a mere *possibility* a risk that has already materialized."

16

17          [7] With specific respect to Ms. Jung's May 5, 2022 statement that "Q2 is where we're
    seeing the pressure from the net SG&A perspective" (Am. Compl. ¶ 126 (quoting 1Q22 Call. Tr.
18  at 10)), the court disagrees with Plaintiffs' framing of this statement as "mixed."  (*See* MTD
    Resp. at 15.)  *Wochos* is instructive.  There, the Ninth Circuit addressed an "August 2 statement
19  [] made in response to a question about anticipated gross margins for the third quarter of 2017,
    which still had nearly two months left to go."  985 F.3d at 1198.  The court upheld the district
20  court's conclusion "that it was a 'projection, rather than a statement about then-current
    production levels,'" because when read in context, the remark could "only be understood only as
21  contrasting overall third-quarter expectations with the year-end goal."  *Id.*  The same reasoning
    applies here:  the remark was made with nearly two months remaining in the second quarter, in
22  response to a question about how anticipated second quarter margins might affect year-end goals.
    (*See* 1Q22 Call Tr. at 10.)  Thus, this statement is properly understood as a forward-looking
    projection.

1    *Glazer*, 63 F.4th at 780-81 (holding "boilerplate listing of generic risks" was not

2    meaningful where it failed to "mention the specific risk to which [the defendant] had

3    been alerted").  Similarly critical to this inquiry is whether the Executive Defendants

4    *knew* that hypothetical risks had come to pass or were substantially likely to occur.  *See*

5    *id.* at 781 (rejecting safe harbor argument where defendant "was aware of a significant

6    likelihood that the risk would materialize").  For the reasons explained *supra*, however,

7    Plaintiffs fail to plausibly allege the Executive Defendants actually knew that the risks

8    identified in the disclosures had transpired or were substantially likely to occur at the

9    time the disclosures were made.  (*See supra* § III(C)(1)(a)(i)-(ii).)  And, as noted,

10   Defendants meaningfully revised the ERP-related disclosure issued on August 5, 2022, to

11   inform shareholders of the Oracle delay.  (*See id.* § III(C)(1)(a)(ii).)  The court therefore

12   concludes that all ten forward-looking statements are accompanied by meaningful

13   cautionary language, 15 U.S.C. § 78u-5(i)(1)(A)(i), and these statements meet the

14   requirements for safe harbor protection.

15        Because ten of the challenged statements are subject to safe harbor protection

16   under 15 U.S.C. § 78u-5(c)(1)(A)(i), the court dismisses Plaintiffs' claims as to these

17   statements.  (*See* Am. Compl. ¶¶ 115, 117-18, 120-21, 124-26, 130, 141.)

18             *c.  Opinion and Puffery Statements*

19        Next, several challenged statements are not actionable because they amount to

20   puffery and/or opinion.  (*See* Am. Compl. ¶¶ 116, 133-36, 139, 144-45.)

21        Two statements unquestionably constitute puffery because they reflect nothing

22   more than "vague statements of optimism" that are "not capable of objective

verification." *In re Arrowhead Pharms., Inc. Sec. Litig.*, No. CV 16-08505 PSG-PJW, 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017) ("Puffing language includes vague statements of optimism like 'business couldn't be better' and 'industry-leading,' as well as words like 'strong,' 'robust,' 'well positioned,' 'solid,' and 'improved.'"). This includes Mr. Perlmutter's statement that "we've proven our ability to deliver in difficult environments, and I'm very confident we are well positioned to meet our objectives for the year" (Am. Compl. ¶ 116 (quoting McDonough Decl. ¶ 3, Ex. 2 ("1Q22 Call Tr.") at 7)), and Ms. Jung's statement that "ultimately, we did not want to impair the momentum that we have today" (*id.* ¶ 133 (quoting McDonough Decl. ¶ 7, Ex. 6 ("2Q22 Call Tr.") at 6)). Neither statement provides a "'concrete description of the past and present' that affirmatively create[s] a plausibly misleading impression of a 'state of affairs that differed in a material way from the one that actually existed.'" *Alphabet*, 1 F.4th at 700 (quoting *Quality Sys.*, 865 F.3d at 1144). Accordingly, these puffery statements are not actionable.

Two other statements reflect pure opinion regarding the Oracle delay or the health of Funko's inventory. (*See id.* ¶¶ 136 (quoting 2Q22 Call Tr. at 9 (regarding the Oracle delay, "we don't see it as a major headwind in 2022 so far, but we feel good we made the right decision for the business to not have business interruption as we go into the holiday season")), 144 (quoting McDonough Decl. ¶ 10, Ex. 9 ("3Q22 Call Tr.") at 7 ("We believe that our inventory is generally high quality . . . .")).) Even if these opinions reflected facts that later proved untrue, "an investor cannot state a claim by alleging only that an opinion was wrong." *Omnicare*, 575 U.S. at 194; *see also id.* at 184 ("[A]lthough

1  a plaintiff could later prove [an] opinion erroneous, the words 'I believe' themselves

2  admit[] that possibility, thus precluding liability for an untrue statement of fact.").

3  Moreover, neither of these statements is actionable under the three-part *Omnicare* test

4  because (1) Plaintiffs fail to allege the speakers did not actually hold the stated beliefs,

5  (2) neither statement contains an embedded statement of untrue fact, and (3) neither

6  opinion statement was misleading by omission.  *See Wochos*, 985 F.3d at 1188-89 (citing

7  *Omnicare*, 575 U.S. at 183-85, 188).  With specific respect to the third "misleading by

8  omission" category, Plaintiffs argue Ms. Jung's opinion statement regarding inventory

9  quality misleadingly conveyed that "Funko's inventory consisted of *salable* products—

10 both legally and because customers would want them."  (MTD Resp. at 11.)  Plaintiffs

11 argue Ms. Jung omitted the fact that "Funko's inventory was bloated with millions of

12 dollars of obsolete and aged inventory."  (*Id.*)  But, as discussed, Plaintiffs fall short of

13 pleading Ms. Jung's actual knowledge of the purportedly omitted fact.  (*See supra*

14 § III(C)(1)(a)(i).)  This omissions theory of liability therefore fails in the absence of a

15 showing that the opinion statement "did not 'fairly align[] with the information in [Ms.

16 Jung's] possession at the time.'"  *Glazer*, 63 F.4th at 779 (quoting *Omnicare*, 575 U.S. at

17 189); *see also Atossa*, 868 F.3d at 802 (explaining that "for an opinion to be misleading

18 by omission," it must "omit[] material facts about the [defendant's] inquiry into or

19 knowledge concerning a statement of opinion" (quoting *City of Dearborn Heights*, 856

20 F.3d at 615)).

21        Two more statements reflect both opinion and puffery.  (*See* Am. Compl. ¶¶ 134

22 (quoting 2Q22 Call Tr. at 7 (expressing opinion that "we believe that inventory is

1  generally high quality," and puffing that Funko was "well positioned to meet our

2  consumer demand and support our strong second half growth forecast")), 145 (quoting

3  3Q22 Call Tr. at 8 (expressing opinion that "we think [inventory quality] generally is

4  very healthy right now," and puffing that "in the event where we have seen a pullback a

5  little bit in Q4, we have been making the right edits to our inventory")).)  Thus, neither

6  statement is actionable.

7        Finally, two more challenged statements reflect either opinion or puffery, *and* lack

8  sufficient allegations of falsity.  When asked on the second quarter earnings call about

9  inventory levels, Ms. Jung responded that although "we're now looking into the back half

10  of the year, we feel the inventory is in a really good healthy position, and we're poised to

11  deliver on our back half results," before stating "[i]t was really about just managing

12  through the congestion that we saw so far. . . .  So there is a large portion of the

13  [inventory] in-transit, but we're working to get that into the DC and get that out to our

14  customers."  (*Id.* ¶ 135 (quoting 2Q22 Call Tr. at 8).)  The first portion of the sentence

15  reflects protected opinion.[8]  The second portion of the sentence is not false, as Plaintiffs'

16  own allegations confirm that in or around August 4, 2022, "congestion" existed due to

17  large quantities of inventory "in-transit" that was still getting "into the DC."  (*See id.*

18  ¶¶ 85 (alleging that "[b]y July 2022, the [shipping] containers were arriving [to Buckeye]

19

20      [8]  In addition, "poised to deliver on back half results" constitutes a forward-looking
projection entitled to safe harbor protection under 15 U.S.C. § 78u-5(c)(1)(A)(i).  (*See* 2Q22 Call

21  Tr. at 4 (identified as forward-looking and accompanied by meaningful cautionary language);
2Q22 Form 10-Q at 49-50 (additional meaningful cautionary language incorporated by

22  reference).)

1   en masse, along with the remaining trailers from Washington"), 138(i) (acknowledging

2   that inventory in shipping containers "simply sitting in the parking lot" at Buckeye was

3   "considered 'in-transit'".) And rather than misleading investors by omitting material

4   information, the statement candidly discloses ongoing, significant congestion at Buckeye.

5        Similarly, Mr. Perlmutter stated on Funko's Investor Day that "last, but certainly

6   not least, is the unlock of technology to help us get where we're going faster and better,"

7   and "that's some of the investments that we've made this year." (*Id.* ¶ 139 (quoting

8   Investor Day Tr. at 8).) The first portion of this sentence is a "vague statement[] of

9   optimism" "not capable of objective verification" and therefore constitutes puffery.

10  *Arrowhead Pharms.*, 2017 WL 5635422, at *4. To the extent the second portion of this

11  sentence contains representations about current or past fact, it is neither false nor

12  misleading, as Funko indeed invested in technology in 2022. (*See id.* ¶¶ 47-52, 82

13  (describing the Oracle project and related SG&A costs in 2022)); *see also Wochos*, 985

14  F.3d at 1198 (holding Tesla's remark "that 'great progress' was being made on battery

15  production would potentially be an actionable false statement only if . . . Tesla had been

16  'making no progress at all'").

17       In total, eight challenged statements reflect opinion and/or puffery and thus are not

18  actionable. (*See* Am. Compl. ¶¶ 116, 133-36, 139, 144-45.) The court therefore

19  dismisses Plaintiffs' claims as to these statements.

20            *d. Statements that Are Not False or Misleading*

21       Finally, as to the four remaining challenged statements (*see* Am. Compl.

22  ¶¶ 131-32, 137, 140), Plaintiffs fail to plausibly allege they were false when made or that

1    they created an "impression of a state of affairs that differ[ed] in a material way from the

2    one that actually exist[ed]." *Cutera*, 610 F.3d at 1109.  For example, Plaintiffs challenge

3    Ms. Jung's August 4, 2022 statement that inventory levels were "up 170.9% compared to

4    a year ago, reflecting receipt of delayed inventory." (Am. Compl. ¶ 132 (quoting

5    McDonough Decl. ¶ 6, Ex. 5 ("2Q22 Form 8-K") at 7).)  Plaintiffs argue this statement

6    "attribut[ed] the increase in Funko's inventory *solely* to 'receipt of delayed inventory,'"

7    omitting that the increase stemmed from other factors too, like the receipt of dead

8    inventory from Washington warehouses.  (*Id.* ¶ 138(a) (emphasis added).)  But as

9    Defendants explain, Ms. Jung never said "that delayed inventory was the only factor

10   contributing to the increase," and the amended complaint shows that "the receipt of

11   delayed inventory *did* contribute to the increases."  (MTD at 16 (citing Am. Compl.

12   ¶ 138(a)).)  The court is not persuaded by Plaintiffs' attempt to "rewrite" Ms. Jung's

13   statement.  *Wochos*, 985 F.3d at 1193.

14       In sum, Plaintiffs fail to plausibly allege falsity as to any of the 28 challenged

15   statements, and the complaint is therefore dismissed in its entirety.

16       2.  <u>Scienter</u>

17       Beyond falsity problems, dismissal is warranted for the independent reason that

18   Plaintiffs fall short of plausibly alleging scienter.

19       Scienter "is a 'mental state embracing intent to deceive, manipulate, or defraud.'"

20   *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quoting *Tellabs, Inc. v.*

21   *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)).  To adequately plead scienter,

22   the complaint must "state with particularity facts giving rise to a strong inference that the

1   defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  Specifically,

2   the defendants must have "made false or misleading statements either intentionally or

3   with deliberate recklessness." *Nguyen*, 962 F.3d at 414 (quoting *Zucco Partners, LLC v.*

4   *Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).  "[D]eliberate recklessness

5   represents an extreme departure from the standards of ordinary care . . . which presents a

6   danger of misleading buyers or sellers that is either known to the defendant or is so

7   obvious that the actor must have been aware of it.'" *Espy v. J2 Glob., Inc.*, --- F.4th ----,

8   No. 22-55829, 2024 WL 1689091, at *4 (9th Cir. Apr. 19, 2024) (quoting *Zucco*, 552

9   F.3d at 991).  The scienter element is met "[o]nly if a reasonable person would deem the

10  inference of scienter cogent and at least as compelling as any opposing inference one

11  could draw from the facts alleged." *Nguyen*, 962 F.3d at 414 (quoting *Tellabs*, 551 U.S.

12  at 324).  The "inquiry is inherently comparative," requiring the court to consider

13  "plausible opposing inferences." *Id.* (quoting *Tellabs*, 551 U.S. at 324).  Although the

14  scienter inquiry must be performed "holistically," the Ninth Circuit has directed that "it

15  would be folly to simply skirt the major allegations." *Webb v. Solarcity Corp.*, 884 F.3d

16  844, 851 (9th Cir. 2018) (quoting *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,

17  704 (9th Cir. 2012)).

18       Here, as an initial matter, there appears to be no dispute that the amended

19  complaint lacks a coherent theory of motive to defraud.  (*See* MTD at 17; MTD Resp. at

20  24 n.17; MTD Reply at 7.)  "Generally, we expect that a financial motive for securities

21  fraud will be clear." *Prodnova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108

22  (9th Cir. 2021) ("[F]or example, someone inside a company stands to gain a substantial

1  profit by engaging in deceptive behavior, such as selling shares before the company

2  discloses negative information.").  Although lack of a plausible motive is not fatal, it

3  "makes it much less likely that a plaintiff can show a strong inference of scienter." *Id.*

4  "Only where a complaint otherwise asserts compelling and particularized facts showing

5  fraudulent intent or deliberate recklessness will we overlook the failure to allege a

6  plausible motive." *Id.*  The court therefore addresses Plaintiffs' primary scienter theories

7  before evaluating the amended complaint holistically to determine whether "compelling

8  and particularized facts" give rise to a strong inference of scienter, despite the absence of

9  allegations demonstrating motive.  *Id.*

10          *a.  Individual Scienter Theories*

11       Plaintiffs raise several theories of scienter, including the core operations doctrine,

12  confidential witness accounts, prior litigation, and more.  (MTD Resp. 17-24; *see also*

13  Am. Compl. ¶¶ 147-58.)  The court addresses each in turn, below.

14          i.   Core Operations Doctrine

15       The core operations doctrine is a "narrow" scienter theory, *Zucco*, 552 F.3d at

16  1000, that permits the court in limited circumstances to "infer[] that facts critical to a

17  business's 'core operations' or an important transaction are known to a company's key

18  officers." *S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008) ("*South Ferry*

19  *I*").  The doctrine may satisfy the PSLRA's heightened pleading standard in two

20  situations.  *Zucco,* 552 F.3d at 1000 (citing *S. Ferry I*, 542 F.3d at 785).  First, "general

21  allegations about 'management's role in a corporate structure and the importance of the

22  corporate information about which management made false or misleading statements'"

1    may "create a strong inference of scienter when these allegations are buttressed with

2    'detailed and specific allegations about management's exposure to factual information

3    within the company.'" *Id.* (quoting *S. Ferry I*, 542 F.3d at 785).  Second, if the complaint

4    lacks additional detailed allegations about the defendants' actual exposure to information,

5    generalized allegations about a company's "core operations" standing alone may

6    nonetheless be indicative of scienter "where the falsity is patently obvious—where the

7    'facts [are] prominent enough that it would be "absurd to suggest" that top management

8    was unaware of them.'" *Id.* at 1001 (quoting *Berson*, 527 F.3d at 989).  This second

9    category of cases is "exceedingly rare." *S. Ferry I*, 542 F.3d at 785 n.3.

10           Here, Plaintiffs fail to allege facts that satisfy either situation.  First, Plaintiffs fail

11   to set forth "detailed and specific allegations" showing how the Executive Defendants

12   were "expos[ed] to factual information within the company." *Id.* at 785.  As discussed

13   *supra* § III(C)(1)(a)(i)-(ii), Plaintiffs offer only "[g]eneral allegations of defendants'

14   hands-on management style, their interaction with other officers and employees, their

15   attendance at meetings, and their receipt of unspecified weekly or monthly reports," all of

16   which is "insufficient" to plausibly allege scienter. *In re Daou Sys., Inc.*, 411 F.3d 1006,

17   1022 (9th Cir. 2005) (internal quotation marks omitted), *abrogated on other grounds as*

18   *recognized by Glazer*, 63 F.4th at 766.  Relying on *South Ferry LP #2 v. Killinger*, 687 F.

19   Supp. 2d 1248 (W.D. Wash. 2009) ("*South Ferry II*"), Plaintiffs argue the Executive

20   Defendants held themselves out as knowledgeable in response to direct questioning,

21   which is "sufficient to satisfy the actual knowledge analysis."  (MTD Resp. at 21

22   (quoting *S. Ferry II*, 687 F. Supp. 2d at 1259-60).)  In *South Ferry II*, the district court on

1    remand found sufficiently particularized allegations regarding the defendant CEO's

2    knowledge to establish scienter because the defendant's public statements themselves

3    "represented that he had access to the information that underpinned his sunny

4    announcements about [the company's] risk-management capabilities."  687 F. Supp. 2d at

5    1259-60 (finding the defendant, "in the face of *direct questioning*," "maintained that he

6    knew what he was talking about" and "displayed an intimate knowledge" of the relevant

7    topics, which he discussed "with a high degree of specificity on more than one

8    occasion").  The court concludes that in this case, the Executive Defendants' public

9    statements do not evince such intimate, personal knowledge with a "high degree of

10   specificity."  *Id.*  For example, the generalized statements that "we are constantly looking

11   at the quality of our inventory," that Funko had experienced "supply chain challenges,"

12   and that inventory "generally is very healthy right now," (Am. Compl. ¶ 154(e)), do not

13   rise to "*specific* admissions from top executives" that they personally were "involved in

14   *every detail*" of inventory monitoring or that they knew "*exactly* how much" inventory

15   was lost, slow-moving, dead, and would ultimately be written down, *Zucco*, 552 F.3d at

16   1000 (emphasis added) (quoting *Daou*, 411 F.3d at 1022-23).

17          Second, this is not the "exceedingly rare" and "unusual" case where the court can

18   impute knowledge to the Executive Defendants solely through their executive roles,

19   without particularized allegations regarding their actual exposure to information.  *S.*

20   *Ferry I*, 542 F.3d at 785 & n.3.  For example, that Funko was accumulating excess dead

21   inventory at the Buckeye DC would not have been patently obvious to senior executives

22   based on "granular details . . . such as the state of the storage racks, that certain machines

'could [not] reach the top several shelves,'" "that there were 'pallets of partial orders' on the warehouse floor,'" or the presence of shipping containers in the parking lot.  (MTD Reply at 10 (quoting Am. Compl. ¶¶ 9, 11)); *see also Ferreira*, 2021 WL 8820650, at *20 (holding Plaintiffs failed to plausibly show defendants "were aware of the existence of [shipping] containers" full of dead inventory in the Funko parking lot and the Port of Seattle, or that defendants were "aware of their contents, how they obtained this understanding, or even how long these containers were stored in these locations").  With respect to the Oracle Project, the court is not persuaded that ongoing data issues would have been so "prominent" that senior executives not personally involved in the intricacies of the data transfer process *must* have known that "ERP system implementation would not be possible by" the targeted date.  (Am. Compl. ¶ 8.)  And although the Executive Defendants were involved in high-level "systems architecture decisions" (*id.* ¶ 53) related to ERP implementation, Plaintiffs have not alleged particularized facts about what those decisions were or their effect on the project timeline.  (*See supra* § III(C)(1)(a)(ii).) Absent these details, the court cannot draw the inference that the falsity of Defendants' statements concerning the Oracle Project timeline was "patently obvious." *Zucco,* 552 F.3d at 1000.

Accordingly, the core operations doctrine does not give rise to a strong inference of scienter in this case.

ii.  Confidential Witnesses

Plaintiffs' confidential witness ("CW") allegations similarly fail.  (*See* MTD Resp. at 18-19.)  CWs (1) "must be described with sufficient particularity to establish their

reliability and personal knowledge," and (2) must offer accounts that are

"themselves . . . indicative of scienter." *Zucco*, 552 F.3d at 995.  Plaintiffs fail at both

steps.

First, Plaintiffs' most direct (and perhaps strongest) CW allegation concerns an

employee who told Ms. Jung "in January or February 2022 during a one-on-one video

call that the employee could not see the Oracle program being completed on time and that

the project was not going well."  (Am. Compl. ¶ 54.)  But Plaintiffs offer no details about

the CW's personal knowledge of the matter beyond his or her "cleaning [of] one business

unit's financial data" in preparation for the Oracle launch.  (*Id.*)  In fact, this CW account

pre-dates the Proposed Class Period and Plaintiffs make no allegation that Funko

employed the CW at all during the Proposed Class Period.  (*See id.*)  Without more, the

court cannot credit this CW as reliable and having the requisite personal knowledge.  *See*

*Zucco*, 552 F.3d at 996-97 (concluding CWs were unreliable because they "were not

employed by [defendant] during the time period in question" and the court could "discern

no basis for" their claims absent more detail); *see also Ferreira*, 2021 WL 8820650, at

*32 (finding CWs unreliable where neither "were employed by Funko during the Class

Period"); *In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222 CW, 2010 WL 199703, at

*8 (N.D. Cal. Jan. 13, 2010) ("Four of the [CWs] . . . were not employed [by defendant]

during the Class Period, which makes it unlikely that they had personal knowledge of

Defendants' relevant state of mind.").

Second, assuming without deciding that Plaintiffs' other CWs are reliable and

have personal knowledge, the remaining CW allegations are not themselves indicative of

scienter.  In general, the CW accounts amount to vague allegations of internal

disagreement and concern that establish, at most, a serious disconnect between Funko's

C-Suite and its operations on the ground.  (*See, e.g.*, Am. Compl. ¶¶ 44 (alleging

employee disagreed with "unrealistically optimistic" sales forecasts), 51 (alleging

employee voiced concerns to a VP and Manager about Funko's "lack of data governance

controls during team meetings to discuss the Oracle project"), 64 (alleging "numerous

employees" stated "it was evident inside [Funko] that the ERP would not be operative by

July or August 2022"), 70-72 (alleging a "former Operations Lead" "wrote a heated letter

to an Operations Manager" complaining about inventory operations at Buckeye), 78

(alleging a warehouse supervisor discussed the accumulation of dead inventory at

Buckeye with the Senior Director of Fulfillment Operations and an Assistant General

Manager), 81 (alleging a warehouse supervisor thought Ms. Jung's optimistic statement

about Oracle implementation "was a weird thing to say").)  None of these CW allegations

establish that the Executive Defendants personally knew the extent of Funko's

ground-level problems and intentionally or with deliberate recklessness concealed that

information from investors.  As the Ninth Circuit recently put it, "[d]issatisfaction with a

company's strategy, management, and approach . . . coupled with a stock drop, make for

interesting reading but not an actionable securities fraud claim."  *Espy*, 2024 WL

1689091, at *1; *see also id.* at *5 (rejecting CW allegations that amounted to mere

"criticisms" and "negative opinions"); *Zucco*, 552 F.3d at 998 (rejecting finding of

deliberate recklessness based on CW accounts that showed only "some disagreement

within the corporation"); *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192,

1   1211, 1213 (D. Ariz. 2009) (holding "[v]ague allegations of disagreement and concern"

2   did not establish defendants' deliberate recklessness); *In re Watchguard Sec. Litig.*, No.

3   C05-0678JLR, 2006 WL 2927663, at *7 (W.D. Wash. Oct. 12, 2006) ("Although each of

4   the [C]Ws was one or two 'direct reports' away from a Defendant, there is no indication

5   that any Defendant acquired any [C]Ws' (or anyone else's) knowledge of WatchGuard's

6   ground-level problems."). *Cf. Ferreira*, 2021 WL 8820650, at *33 (finding strong

7   inference of scienter based on CW's "particularized allegations" that defendants "knew

8   specific details about" Funko's accumulation of "obsolete inventory valued at several

9   million dollars," including the "amount," "value," and "volume," because defendants

10  received "aged inventory reports, the Open to Buy plan data, and emails summarizing the

11  discussion at every weekly sales meeting" over several months).

12      Accordingly, Plaintiffs' confidential witness accounts do not, on their own, give

13  rise to a strong inference of scienter.

14              iii. Prior Litigation

15      Plaintiffs next raise scienter allegations related to the previous lawsuit against

16  Funko and its senior executives, which ensued following a write down of $16.8 million in

17  excess dead inventory that had accumulated in 2019.  (Am. Compl. ¶ 155 & n.8 (citing

18  *Ferreira*, 2021 WL 8820650, at *15, *20-22 (denying motion to dismiss in part and

19  directing defendants to answer second amended complaint)); *see also id.* ¶ 155 (noting

20  the case settled following the court's partial denial of the motion to dismiss).)  Plaintiffs

21  argue Defendants' involvement "in securities fraud litigation regarding some of the very

22  same conduct as alleged above within *six months* of the start of the Class Period further

1   supports a strong inference of scienter." (*Id.*; *see also* MTD Resp. at 23-24.)  This court,

2   however, is not persuaded that separate litigation involving a different time period and

3   different, now-settled claims "'should have put the [defendants] on notice that" the

4   statements at issue here "were misleading." (MTD Resp. at 23 (quoting *In re Refco, Inc.*

5   *Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007))); *see also Pugh v. Tribune Co.*,

6   521 F.3d 686, 695 (9th Cir. 2008) ("[*A*]*ccusations* of fraud" as opposed to "fraud itself"

7   do "not establish a strong inference of scienter.").

8                    iv.      Remaining Scienter Allegations

9          Lastly, Plaintiffs argue the Executive Defendants' Sarbanes-Oxley "(SOX")

10   certifications, Mr. Perlmutter's demotion, and Ms. Jung's termination each raise a strong

11   inference of scienter. (MTD Resp. at 22-23.)  But these factors alone "add nothing

12   substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003-04 (regarding SOX

13   certifications); *see also Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1078

14   (C.D. Cal. 2012) ("[N]otable departures are not in and of themselves evidence of

15   scienter." (quoting *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069,

16   1093 (N.D. Cal. 2005) ("Most major stock losses are often accompanied by management

17   departures, and it would be unwise for courts to penalize directors for these

18   decisions.")))  Accordingly, none of Plaintiffs' individual scienter allegations are

19   sufficiently "compelling and particularized" to raise a strong inference of scienter.

20                    b.  *Holistic Analysis*

21          A holistic view of the amended complaint does not change the court's conclusion.

22   Plaintiffs paint a dubious picture of fraud, alleging the Executive Defendants

1 intentionally inflated the value of Funko stock by concealing a "multi-million-dollar

2 stockpile" of dead inventory and the "disastrous consequences of two highly-touted

3 infrastructure upgrades" (MTD Resp. at 1), while also revealing the truth of the same in

4 "a series of partial disclosures" issued throughout the Proposed Class Period (Am.

5 Compl. ¶ 160).   Having considered the factual allegations all together and in the light

6 most favorable to Plaintiffs, the court concludes the inference that the Executive

7 Defendants acted with scienter is less compelling than the contrary inference of

8 nonculpable conduct.  Indeed, it is more plausible to infer that (1) the Executive

9 Defendants lacked specific details about the infrastructural problems unfolding on the

10 ground; (2) Funko promptly disclosed the delay once it became clear that the Oracle

11 Project would not launch on time; (3) Funko promptly disclosed (and continued to

12 disclose) rising operational costs once they became apparent; (4) the Executive

13 Defendants genuinely viewed those costs as temporary, stemming from short-term

14 congestion at Buckeye due to the DC launch and pandemic-related transit delays; (5) the

15 Executive Defendants sincerely believed that Funko's inventory was healthy overall and

16 that Funko would meet its financial projections; (6) in hindsight, those projections proved

17 far too optimistic; and, (7) naturally, the Executive Defendants faced personal

18 consequences for their corporate failures.

19     Plaintiffs therefore fall short of pleading facts giving rise to a "strong" and

20 "cogent" inference of scienter that is "at least as compelling as any opposing inference

21 one could draw from the facts alleged." *Nguyen*, 962 F.3d at 414.  This conclusion

22 follows from "the lack of a plausible motive as well as the lack of particularized facts

1 │ showing any individual's knowledge or deliberate recklessness" under the circumstances.

2 │ *Prodanova v. H.C. Wainwright & Co.*, LLC, 993 F.3d 1097, 1113 (9th Cir. 2021).

3 │ **D.    Plaintiffs' Claims Under Section 20(a)**

4 │        A Section 20(a) claim requires underlying primary violations of the securities

5 │ laws.  15 U.S.C. § 78t(a); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th

6 │ Cir. 2012).  Because Plaintiffs have failed to plead an underlying violation of the federal

7 │ securities laws, their Section 20(a) claims must be dismissed.

8 │ **E.    Leave to Amend**

9 │        This court must apply the Ninth Circuit's policy favoring leave to amend with

10 │ "extreme liberality."  *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)

11 │ (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)).  "Dismissal without

12 │ leave to amend is improper unless it is clear . . . that the complaint could not be saved by

13 │ any amendment."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002) (quoting

14 │ *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)).  Because Plaintiffs

15 │ could plead facts that cure the deficiencies identified herein, the court will grant them

16 │ leave to amend.

17 │ **IV.    CONCLUSION**

18 │        For the foregoing reasons, the court GRANTS Defendants' motion to dismiss

19 │ (Dkt. # 39), and GRANTS Plaintiffs leave to file a second amended complaint.  The court

20 │ ORDERS the parties to file, by no later than May 23, 2024, a joint statement that

21 │ (1) proposes a schedule for the filing of a second amended complaint, and any answer to

22 │ //

the amended complaint or motion to dismiss the same, and (2) informs the court whether

the parties object to amending the caption (*see supra* at 11 n.4).

Dated this 16th day of May, 2024.

JAMES L. ROBART
United States District Judge

ORDER - 49